**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| **GOLZAR AMIRMOTAZEDI**, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No.10-765 (GK) |
| **VIACOM, INC.**, <u>et</u> <u>al.</u>, | ) ) | |
| Defendants. | ) ) | |

## **MEMORANDUM OPINION**

On April 21, 2010, Plaintiff Golzar Amirmotazedi brought this action in the Superior Court for the District of Columbia alleging invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress against Defendants Viacom, Inc., MTV Networks, and Bunim-Murray Productions ("Defendants"). On May 12, 2010, Defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. This matter is presently before the Court on Defendants' Motion to Compel Arbitration, or in the Alternative, to Stay the Litigation [Dkt. No. 12] ("Defs.' Mot."). Upon consideration of the Motion, the Opposition, and the Reply, and for the reasons set forth herein, Defendants' Motion to Compel Arbitration is **denied**.

**I. Background**

**A. Factual History**[1]

Defendants produce and televise a reality show named The Real World. Defs.' Answer ¶ 5. Each season, the show chronicles the career ambitions, friendships, and romantic attachments of a different group of young people living in a house together for several months. Defs.' Mot. at 1-2. Individuals audition to be cast on the program, and cameras follow the cast members both inside and outside of the group house. Id. at 2. In the fall of 2009, The Real World was set in the District of Columbia ("D.C."), and the housemates resided in a town house in the Dupont Circle area of D.C. Compl. ¶ 6.

Because the show chronicles the cast members' lives both inside and outside of their group house, it often features members of the public with whom the cast members interact. Defs.' Mot. at 2. It is the show's policy to obtain the consent of such individuals to appear on the show before including them in an episode. Id. If an individual chooses to enter The Real World group house, access to which is limited by Defendants, he or she must first sign a Voluntary Participation Agreement (Guest Release), which governs the terms of their entry into the group house. Id. at 3. The Voluntary Participation Agreement (Guest Release) contains

---

[1] All facts herein are undisputed except where specifically indicated otherwise.

an arbitration provision ("Arbitration Agreement") that assigns the final determination of "any controversy or claim arising out of or relating to this Agreement" to binding arbitration. See Voluntary Participation Agreement (Guest Release) and Arbitration Provision at ¶ 11 (Ex. A to Defs.' Mot.).

On September 10, 2009, Plaintiff, a twenty-two year old woman, encountered The Real World's cast members for the first time at a restaurant in the Georgetown area of Washington, D.C., where she was filmed by the production crew. Defs.' Mot. at 2. The next evening, on September 11, 2009, Plaintiff met the cast members again at The Sign of the Whale, a mid-town Washington, D.C. bar and restaurant. Once again, the production crew filmed Plaintiff. Id.; Compl. ¶¶ 7-8.

The precise events of September 11, 2009 that gave rise to this suit are the subject of some dispute. It is undisputed that Plaintiff and a companion named Isabella were walking by the Sign of the Whale that evening when they encountered some male cast members near the restaurant. Compl. ¶¶ 7-8. The male cast members invited Plaintiff and Isabella to join them inside the restaurant, and the latter agreed. Id. ¶ 8.

The parties dispute what occurred after Plaintiff entered the restaurant. Plaintiff alleges that from 11:00 p.m. until approximately 1:30 a.m., the cast members "fed [her]" between 8 and 10 alcoholic beverages. Id. ¶ 9. Although Plaintiff claims she has

3

no recollection of leaving the restaurant because of her intoxicated state, she believes that she and the other cast members left the restaurant around 1:30 a.m. and went to The Real World group house. Id. ¶¶ 9-10. Before entering the group house, Plaintiff signed and dated the Arbitration Agreement and gave her name, date of birth, address, and telephone number. Defs.' Mot. at 4; Ex. A to Defs.' Mot. at 4. At or around 3:00 a.m., however, Plaintiff alleges that Defendants, over her objections and fully aware of her intoxicated state, threw her out of the house because she did not wish to have sexual relations with one of the male cast members. Compl. ¶ 11.

The parties also dispute the extent of Plaintiff's intoxication. Amirmotazedi does not deny that she signed the Arbitration Agreement before entering The Real World residence but claims she has no recollection of having done so because she was heavily intoxicated. Pl.'s Opp'n at 6. Defendants contend that Plaintiff was not intoxicated when she entered the house or when she signed the four-page Arbitration Agreement just prior to entering the house. Defs. Mot. at 18. In support of their contention, Defendants offer evidence that the show's producers, who were present the night of September 11, 2009, did not believe Amirmotazedi to have been intoxicated, and that it is the program's policy to prohibit intoxicated individuals from entering or remaining in The Real World residence. Id. Defendants also rely on

4

video footage from that evening which features Plaintiff and which, Defendants argue, proves that she was not so intoxicated that she could not have entered into a legally binding agreement to arbitrate. Id. at 19.

On or about March 10, 2010, Defendants aired two episodes of The Real World entitled "Girlfriends and Dead Ends" and "Aftershow." Compl. ¶ 12. The parties dispute the way in which Plaintiff was portrayed on the episodes. Defendants claim that the episodes "speak for themselves," accurately depicting Plaintiff's conduct. Answer ¶ 15. Plaintiff contends that the episodes contained edited video footage that misrepresented her as an individual with multiple emotional and psychological problems. Compl. ¶ 13. In particular, the episodes showed various cast members referring to Plaintiff as "that ugly girl" and a "hot mess," and a male cast member referring to her as the "girl he could not get rid of." Id. ¶ 14-15. The episodes also disclosed statements that Plaintiff made but wished to keep private, such as remarks that she was bullied in high school, has "problems, and wears sunglasses frequently because she suffers from anxiety." Id. ¶ 15.

Outtakes from the episodes, entitled "Too Much Andrew Attention," were later posted on Defendants' The Real World Dailies website. Id. ¶ 17. Defendants dispute Plaintiff's claim that the portrayal of her in the episodes and outtakes gave rise to

offensive, humiliating comments on websites operated by Defendants and others. Id. ¶ 19.

On or about March 30, 2010, Plaintiff's attorney notified Defendants that the episodes and outtakes had caused Amirmotazedi public ridicule and emotional distress. Id. ¶ 21. In response, Defendant MTV Networks, Inc. forwarded Plaintiff's concerns to Defendant Bunim-Murray Productions, but did not cease dissemination of the episodes. Id. ¶ 22.

**B. Procedural History**

On April 16, 2010, Plaintiff filed the instant Complaint in the Superior Court of the District of Columbia [Ex. B to Dkt. No. 1]. On May 12, 2010, Defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Plaintiff alleges, in Counts I and II of her Complaint, that Defendants invaded her privacy by portraying her in a false light and by disclosing private facts about her without her consent. Id. at ¶¶ 23-34. In Count III, she alleges that Defendants intentionally caused her emotional distress by airing the episodes and outtakes and by continuing to disseminate the footage after she notified Defendants that the footage had caused her severe emotional distress. Id. at ¶¶ 35-39. Lastly, in Count IV, Plaintiff claims that Defendants negligently caused her emotional distress by airing the footage. Id. at ¶¶ 40-44. With regards to Counts III and IV, Plaintiff emphasizes that Defendants knew or should have known that she was

particularly susceptible to emotional distress because she stated in part of the footage that she suffers from anxiety. Id. ¶¶ 36, 41. Plaintiff seeks compensatory damages in excess of $5 million and punitive damages. Id. ¶ 45.

On June 18, 2010, Defendants filed an Answer denying Plaintiff's claims [Dkt. No. 10]. On July 6, 2010, Defendants filed a Motion to Compel Arbitration or, in the Alternative, to Stay the Litigation. In their Motion, Defendants argue that Plaintiff waived her right to file a lawsuit for any claims "arising out of or relating to" the Arbitration Agreement when she signed it, and must instead submit her claims in Counts I-IV to arbitration. Defs.' Mot. at 12-15 (quoting Ex. A to Defs.' Mot. at ¶ 11).

On August 10, 2010, Plaintiff filed an Opposition to Defendants' Motion. Plaintiff responds that she lacked the mental capacity to sign the Arbitration Agreement the night of September 11, 2009, because she was heavily intoxicated. Thus, Plaintiff argues, the Court must deny Defendants' Motion under § 4 of the Federal Arbitration Act, which prohibits a court from granting a petition to compel arbitration when "the making of the agreement for arbitration" is in dispute. See Pl.'s Opp'n at 9; 9 U.S.C. § 4. Plaintiff further argues that, because there is a genuine dispute as to whether she had the capacity to enter into the Arbitration Agreement in light of her intoxicated state, summary judgment on the issue is not appropriate. Id. at 10-12.

7

Finally, on August 20, 2010, Defendants filed a Reply to Plaintiff's Opposition. In their Reply, Defendants contend that Plaintiff cannot meet her burden of proof on intoxication and that Plaintiff's alleged intoxication is an issue for the arbitrator to decide in the first instance. Defs.' Reply at 2, 6.

**II. Standard of Review**

Defendants have styled their Motion as a Motion to Compel Arbitration, or, in the Alternative, to Stay the Litigation. Such motions are properly reviewed under the summary judgment standard of Rule 56(c) of the Federal Rules of Civil Procedure. Aliron Intern., Inc. v. Cherokee Nation Industries, Inc., 531 F.3d 863, 865 (D.C. Cir. 2008); Hughes v. CACI, Inc., 384 F.Supp.2d 89, 92-93 (D.D.C. 2005) ("'[I]nasmuch as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate[,]' consideration of the motion according to the 'standard used by district courts in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c) . . . is appropriate.'") (quoting Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 n.9 (3d Cir. 1980)).

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotations omitted); see Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (nonmoving party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor).

In deciding a motion for summary judgment or, in this case, a motion to compel arbitration, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Ultimately, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-

52, 106 S.Ct. 2505.

**III. Analysis**

   **A.   Relevant Provisions of the Federal Arbitration Act**

By enacting the FAA, 9 U.S.C. §§ 1 et seq., Congress "manifest[ed] a liberal federal policy favoring arbitration agreements." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The FAA provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Under the FAA, "[t]here is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted disputes. Doubts should be resolved in favor of coverage.'" Jung v. Ass'n of Am. Med. Colls., 300 F.Supp.2d 119, 144-45 (D.D.C. 2004) (quoting AT&T Tech., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)); see also Moses H. Cone Mem'l Hosp. v. Mercury

10

Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 476, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (stating that "ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration").

However, the FAA also dictates that certain issues must be decided by the courts. Section 4 of the FAA, which is at issue in this case, provides that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. Plaintiff argues that her intoxication defense places the "making of the arbitration agreement" at issue and therefore her defense must be resolved by a court. Pl.'s Opp'n at 9. Defendants argue, on the other hand, that the case law compels the conclusion that the intoxication challenge should be decided by the arbitrator in the first instance. Defs.' Reply at 2, 6.

## B. Arbitrability of the Parties' Dispute

The Court will thus consider whether, under the FAA and other governing law,[2] the parties' dispute must be submitted to the arbitrator to determine whether Plaintiff's alleged intoxication prevented the formation of an agreement. The Supreme Court has offered some guidance on the interpretation of § 4 of the FAA. In Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Supreme Court dealt with the plaintiff's claim that an agreement containing an arbitration provision was fraudulently induced. The Court held that "claims of fraud in the inducement of the contract generally" do not place the "making of the agreement for arbitration" at issue and must therefore be submitted for arbitration under § 4. Id. at 404, 87 S.Ct. 1801. In contrast, "claims of fraud in the inducement of the

---

[2] The Agreement states that California law shall govern "any dispute arising from or in connection with this agreement." Ex. A ¶ 12. However, in cases such as this where one party is alleging that no contract was formed, it would be premature to enforce the choice of law provision before deciding whether an agreement exists. See Green v. Charter One Bank, 640 F.Supp.2d 998, 1004 n.6 (N.D. Ill. 2009) ("Given that [one party] is arguing that no contract was formed, no assumption regarding the parties' choice of law can be made at this stage."); Bd. of Educ. of the Twp. of Cherry Hill, Camden County v. Human Res. Microsys., Inc., No. 09-5766 (JBS/JS), 2010 WL 3882498, at *3 (D.N.J. Sept. 28, 2010) ("Since this Court has not yet determined [the issue of whether the contract is void], it is premature to decide to enforce the contract's choice-of-law provision."). In any event, the Court's analysis of § 4 of the FAA would not differ if California law were to apply instead of District of Columbia law. See Defs.' Mot. at 7 n.6 (noting that "the result under the FAA would be no different in this case" whether District of Columbia or California law were to apply).

12

arbitration clause itself" must be decided by the court. Id. Thus, the Court drew a distinction between challenges to an agreement which contains an arbitration provision, which must first go to the arbitrator, and challenges to the specific arbitration provision of an agreement, which must be decided first by the court.

Only two Circuits--the Fifth Circuit and the Tenth Circuit--have addressed the issue of mental capacity defenses in light of Prima Paint's distinction between specific challenges to the arbitration provision and general challenges to an entire contract. See Primerica Life Ins. Co. v. Brown, 304 F.3d 469 (5th Cir. 2002); Spahr v. Secco, 330 F.3d 1266 (10th Cir. 2003). The Fifth and Tenth Circuits disagree on whether, under § 4 of the FAA, mental capacity defenses should be submitted to the court or the arbitrator in the first instance.

In Primerica Life Ins. Co. v. Brown, 304 F.3d 469, 472 (5th Cir. 2002), the Fifth Circuit held that a mental capacity defense of mental retardation to an Agreement containing an arbitration clause must be submitted to an arbitrator in the first instance.[3] The Court reasoned that, pursuant to Prima Paint, only mental

---

[3] Plaintiff suggests that the Fifth Circuit retreated from its holding in Primerica when it decided that a challenge based on one party's alleged failure to sign a contract went to the making of the agreement, and therefore was not controlled by Prima Paint. See Pl.'s Opp'n at 11 n.3 (discussing Banc One Acceptance Corp. v. Hill, 367 F.2d 426, 430 (5th Cir. 2004)). Because Banc One Acceptance Corp. does not address a mental capacity defense, this Court does not agree that it affects the Fifth Circuit's holding in Primerica.

13

capacity challenges that specifically challenge the arbitration provision of an Agreement could be decided by the court, but that mental capacity defenses to a whole contract must be submitted for arbitration. Id. at 471-72.

The Tenth Circuit disagreed with the reasoning of Primerica and came to the opposite conclusion. In Spahr v. Secco, 330 F.3d 1266, 1273 (10th Cir. 2003), the Tenth Circuit held that a mental capacity defense of dementia and Alzheimer's Disease should be heard by the court for decision in the first instance. The court reasoned that mental capacity challenges, by their very nature, cannot be specifically aimed at a contract's arbitration provision but are directed at the agreement in whole. In other words, it would be illogical for a party to claim that a lack of mental capacity affected his or her ability to enter into a particular provision of a contract concerning arbitration, but not others. Consequently, the Court reasoned that the general challenge/specific challenge distinction drawn in Prima Paint is inapplicable to mental capacity defenses. Id.

After Primerica and Spahr were decided, the Supreme Court revisited Prima Paint in Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), and held that "unless the challenge is to the arbitration clause itself [as opposed to the contract as a whole], the issue of the contract's validity is considered by the arbitrator in the first

14

instance." By the same token, if the challenge is to the arbitration clause itself, the issue is to be considered by the court in the first instance. Id. Although the Court found Prima Paint to be controlling, it specifically noted that it was not presented with the issue of whether mental capacity defenses, which raise the question of whether any agreement to arbitrate was ever concluded, should be decided by the arbitrator or the court under the FAA. Id. at 444 n.1, 126 S.Ct. 1204. Thus, Buckeye made clear that Prima Paint's holding does not control cases such as this one, where one party to the arbitration agreement is relying upon a mental capacity defense. Id.

Since neither Prima Paint nor Buckeye is controlling in this case, this Court joins the other courts which have found the Tenth Circuit's reasoning in Spahr to be persuasive. See Moran v. Svete, 366 Fed. Appx. 624, 632 (6th Cir. 2010) (distinguishing between cases in which it is alleged the signer lacked the mental capacity to assent, which go to the existence of the agreement, and cases where the signer acted "ultra vires," which go to the validity of the agreement and are therefore properly submitted to the arbitrator); Reynolds v. Credit Solutions, Inc., 541 F.Supp.2d 1248, 1263 (N.D. Ala. 2008) (explaining that district courts, in aftermath of Buckeye, recognize that challenges to signatory power, including mental capacity defenses, are decided by the court); Washburn v. Beverly Enterprises-Georgia, Inc., No. 106-cv-051, 2006

15

WL 3404804, at *1 (S.D. Ga. 2006) (unpublished opinion) (concluding, on the basis of Spahr, that mental capacity defense to entire agreement was for court to decide); In re Morgan Stanley & Co., Inc., 293 S.W.3d 182, 185-87 (Tex. 2009) (same). In doing so, the Court also notes that this Circuit has "long treated 'disputes over the formation of an agreement to arbitrate--i.e., whether the parties ever agreed to submit anything to arbitration in the first place'--as properly before the district court." Toledano v. O'Connor, 501 F.Supp.2d 127, 139-40 (D.D.C. 2007) (citing Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 850 F.2d 756, 761 (D.C. Cir. 1988)).

In this case, Plaintiff challenges the making of the Arbitration Agreement on the grounds of intoxication. Neither Primerica nor Spahr addresses the specific defense of voluntary intoxication. However, under both District of Columbia and California law, voluntary intoxication is a type of mental capacity defense that permits an individual to avoid a contract if she was so intoxicated at the time of formation that she could not understand the terms and conditions of the agreement. See Harmon v. Johnston, 8 D.C. 139, 1 MacArth. 139, at *3-4 (1873); Phelan v. Gardner, 43 Cal. 306 (1872). Because this mental capacity defense goes to the formation, or the "making" of the Arbitration Agreement, under § 4 of the FAA it must be decided by this Court. Consequently, Defendants' Motion to Compel Arbitration is **denied.**

### C. Summary Judgment on Plaintiff's Voluntary Intoxication Defense Is Not Appropriate

Defendants also seek summary judgment on Plaintiff's intoxication defense, arguing that Plaintiff cannot bear her burden of proof. Defs.' Mot. at 18. Plaintiff disagrees and offers evidence suggesting that she was inebriated when she signed the Agreement. See Pl.'s Opp'n at 13. Whether Plaintiff was so intoxicated on the night of September 11, 2009, that she was incapable of understanding the terms of the Arbitration Agreement is thus a genuine issue of material fact which is in dispute. Consequently, the Court concludes that summary judgment is not appropriate. <u>Reeves</u>, 530 U.S. at 150, 120 S.Ct. 2097 (explaining that a court deciding a motion for summary judgment "may not make credibility determinations or weigh the evidence"). Defendants' Motion to Compel Arbitration is therefore **denied.**

## IV. Conclusion

For the reasons set forth above, Defendants' Motion to Compel Arbitration, or, in the Alternative, to Stay the Litigation, is **denied.** An Order shall accompany this Memorandum Opinion.

March 9, 2011
/s/
Gladys Kessler
United States District Judge

**<u>Copies to</u>: Attorneys of Record via ECF**